J-A17036-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JAMIR WILLIAMS | |
| Appellant | No. 1041 EDA 2015 |

Appeal from the Judgment of Sentence March 20, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0003302-2012

BEFORE: GANTMAN, P.J., LAZARUS, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:       **FILED NOVEMBER 28, 2016**

Appellant, Jamir Williams, appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas, following his jury trial convictions for one count each of first-degree murder and possessing instruments of crime ("PIC").[1] We affirm.

In its opinion, the trial court fully and correctly set forth the facts and procedural history of this case. Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> (1)  DID THE TRIAL COURT ERR AND ABUSE ITS DISCRETION, AND VIOLATE APPELLANT'S RIGHT TO

---

[1] 18 Pa.C.S.A. §§ 2502(a), 907(b).

---

*Retired Senior Judge assigned to the Superior Court.

CONFRONT WITNESSES AGAINST HIM SECURED BY THE SIXTH AND FOURTEENTH [AMENDMENTS] TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE PENNSYLVANIA CONSTITUTION, WHEN IT GRANTED THE COMMONWEALTH'S MOTION *IN LIMINE*, LIMITING APPELLANT'S CROSS EXAMINATION OF EMIL WILLIAMS WITH RESPECT TO HIS PRIOR CRIMINAL RECORD THAT WAS: 1) RELEVANT TO SHOW HIS MOTIVATIONS FOR ENTERING INTO A PLEA AGREEMENT AND FALSELY ACCUSING APPELLANT; 2) REQUIRED TO ESTABLISH THE WITNESS' STATE OF MIND AND BIAS TOWARD THE COMMONWEALTH AT THE TIME HE ENTERED INTO HIS PLEA AGREEMENT, PURSUANT [TO] WHICH HE TESTIFIED?

(2) DID THE TRIAL COURT ERR WHEN IT DENIED APPELLANT'S PRE-TRIAL MOTION TO SUPPRESS HIS STATEMENT TO THE POLICE, AS THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO DR. COOKE'S METHODOLOGY AND FORENSIC CONCLUSIONS ARE UNSUPPORTED BY THE RECORD?

(3) DID THE TRIAL COURT ERR AND ABUSE [ITS] DISCRETION, AND VIOLATE THE RULE AGAINST HEARSAY AND APPELLANT'S RIGHT TO CONFRONT WITNESSES AGAINST HIM SECURED BY THE SIXTH AND FOURTEENTH [AMENDMENTS] TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE PENNSYLVANIA CONSTITUTION, WHEN IT PERMITTED POLICE OFFICER RICHARDSON AND DETECTIVE NOLAN, TO TESTIFY, OVER OBJECTION, TO A DESCRIPTION OF THE ALLEGED SHOOTER PROVIDED BY ALLEGED WITNESS NATHAN BURRELL?

(4) DID THE TRIAL COURT ERR AND ABUSE ITS DISCRETION, AND VIOLATE APPELLANT'S RIGHT TO CONFRONT WITNESSES AGAINST HIM SECURED BY THE SIXTH AND FOURTEENTH [AMENDMENTS] TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE PENNSYLVANIA CONSTITUTION, AND THE RULE AGAINST HEARSAY, WHEN IT PERMITTED DETECTIVE NOLAN TO TESTIFY THAT, ALTHOUGH IT WAS CROWDED AT THE SCENE OF THE OFFENSE, NO WITNESSES INITIALLY CAME FORWARD, AND THAT HE SPOKE WITH A NUMBER OF UNNAMED PEOPLE WHO WITNESSED EVENTS RELEVANT

TO THE CASE, BUT WHO WOULD NOT COOPERATE WITH THE AUTHORITIES?

(5) DID THE TRIAL COURT ERR AND ABUSE ITS DISCRETION AND VIOLATE APPELLANT'S RIGHTS UNDER THE STATE AND FEDERAL CONSTITUTION WHEN IT DENIED PRE-TRIAL MOTIONS *IN LIMINE*: A) TO REDACT FOUL LANGUAGE FROM APPELLANT'S STATEMENT TO THE POLICE; B) TO REDACT HEARSAY-WITHIN-HEARSAY CONTAINED IN APPELLANT'S STATEMENT TO THE POLICE; C) TO REDACT REFERENCES CONTAINED IN APPELLANT'S STATEMENT TO THE POLICE IMPLICATING HIS RIGHT TO REMAIN SILENT AND TO DISCUSSIONS WITH HIS THEN-COUNSEL, WHICH ALSO VIOLATED APPELLANT'S PRIVILEGE AGAINST SELF-INCRIMINATION AND THE RIGHT TO COUNSEL, SECURED BY [THE] SIXTH AND FOURTEENTH [AMENDMENTS] TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 9 OF THE PENNSYLVANIA CONSTITUTION?

(Appellant's Brief at 2-3).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John P. Capuzzi, Sr., we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (**See** Trial Court Opinion with Appendix, filed June 29, 2015, at 14-24) (finding: **(1)** court did not permit defense counsel to elicit testimony about Emil Williams' entire criminal history, conviction by conviction, or any *crimen falsi* convictions older than ten years, but Appellant was free to cross-examine witness about his open criminal case and *crimen falsi* convictions which occurred within the last ten years or for which witness remained under supervision because closed cases provided no motivation for

witness curry favor with Commonwealth; jury heard testimony regarding witness' current plea agreement with Commonwealth; witness stated his sentence could have increased without plea agreement because of his past convictions; jury found witness credible regarding present case; **(2)** police reviewed contents of *Miranda* form with Appellant and Appellant signed on each page; Dr. Cooke's assessment that Appellant is "intellectually disabled" is unsupported by tests required to reach that determination; Dr. Cooke relied almost exclusively on Appellant's own statements regarding Appellant's mental capabilities; Dr. Cooke's opinion that Appellant's statement to police was not knowing or intelligent is contradicted by Appellant's criminal history, familiarity with criminal justice system, and ability to function within community on daily basis; Appellant's statement was knowing, voluntary, and intelligent; **(3)** court permitted testimony from Officer Richardson and Detective Nolan about witness' description of shooter because such testimony was offered to show police course of conduct, based on information provided to police during on-scene investigation, rather than to prove truth of matter asserted; court also gave cautionary instruction to jury;[2] **(4)** detective's statements regarding difficulty in obtaining information from witnesses about shooting was not hearsay or imply Appellant was

---

[2] "[T]he law presumes that the jury will follow the instructions of the court." *Commonwealth v. Rega*, 593 Pa. 659, 692, 933 A.2d 977, 1016 (2007), *cert. denied*, 552 U.S. 1316, 128 S.Ct. 1879, 170 L.Ed.2d 755 (2008).

involved in shooting; testimony was offered only to rebut Appellant's contention at trial that police were inept in their investigation; detective's statements did not violate Appellant's right to confront witnesses against him; **(5)** Appellant's recorded statement is relevant and not unfairly prejudicial; redacting Appellant's statement to omit foul language would have altered context of statement; statements Appellant made to police were not offered to prove Appellant was shooter or that people said Appellant shot Victim, and therefore did not constitute hearsay; Appellant's statement accusing someone else of murder was not incriminating; Appellant is not entitled to relief on any of his issues).[3] The record supports the trial court's decision, and we see no reason to disturb it. Accordingly, we affirm on the basis of the trial court opinion.

Judgment of sentence affirmed.

---

[3] To the extent Appellant argues the trial court violated his rights under the Confrontation Clause in issues 1, 3, and 5, these arguments consist of blanket statements that are undeveloped on appeal. Appellant fails to specify how his issues implicate the Confrontation Clause. Accordingly, Appellant's contentions are waived on appeal. *See Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1262 (Pa.Super. 2014), *appeal denied*, 628 Pa. 627, 104 A.3d 1 (2014) (stating: "The Pennsylvania Rules of Appellate Procedure require that each question an appellant raises be supported by discussion and analysis of pertinent authority, and failure to do so constitutes waiver of the claim").

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/28/2016</u>

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | CP-23-CR-3302-2012 |
| **V.** | |
| **Jamir Williams** | |

A. Sheldon Kovach, Esquire, Deputy District Attorney, for the Commonwealth
Michael Wiseman, Esquire, for the Appellant

## OPINION

Capuzzi, J.                                             Filed: 6/29/2015

On March 20, 2015, Appellant was sentenced to life without parole for the callous execution of Rahim Hicks. On appeal, Appellant alleges: (1) This Court erred when it denied his motion to suppress; (2) this Court abused its discretion when not redacting certain portions of Appellant's statement to police; (3) This Court abused its discretion when permitting testimony from responding officers that an eyewitness provided a description of the shooter; (4) This Court abused its discretion when it did not permit cross-examination on Emil Williams' full criminal history and allowing Emil Williams to testify to a prior consistent statement; and (5) This Court erred when allowing Detective James Nolan to testify that although the scene was crowded, no witnesses initially came forward and people were uncooperative with authorities, as this statement was impermissible hearsay. For the reasons set forth below, all of these allegations lack factual and legal support and Appellant's judgment of sentence should be affirmed.



## FACTUAL BASIS

On July 24, 2010, at approximately 3:30a.m., twenty-one year old Rahim Hicks was outside of J&S Seafood located at 9th and Kerlin in Chester, Delaware County. Appellant, who felt disrespected from an earlier argument with Hicks, arrived at J&S Seafood and told Hicks, "he had something for him," pulled out a gun, and fired four fatal shots into Hicks' body at close range. A stray bullet entered the store and wounded Deron Hudson who was inside purchasing food. Appellant, leaving Hicks to die, fled the scene, picked up his then girlfriend with the gun in the backseat, and while talking on his phone stated: "I had to shoot the bull. I had to shoot the bull four times. I'm not going to let nobody talk to me like this." [1]

Officer Gary Richardson, a six year veteran of the Chester City Police Department was on patrol in the early morning hours of July 24, 2010, in the area of 9th and Louie (sic Lloyd ), approximately four blocks away from 9th and Kerlin Street. [N.T., 10/21/2014 p. 53]. After receiving a report that there was a shooting victim at J&S Seafood, Officer Richardson arrived on scene and saw a black male lying on his side bleeding from a hole in his right arm. [N.T., 10/21/2014 p. 54]. When Officer Richardson asked the victim his name, the victim responded that he had ID. After checking his pockets, Officer Richardson did not find anything to identify the victim. [N.T., 10/21/2014 p. 54]. Officer Richardson asked the victim who shot him but the victim kept repeating that he needed air. [N.T., 10/21/2014 p. 54]. [2]

Corporal Weigand arrived on scene to assist Officer Richardson. [N.T., 10/21/2014 p. 58]. Corporal Weigand asked Hicks where he was shot, to which Hicks responded, "all over." [N.T., 10/21/2014 p. 58]. Hicks began to lose consciousness; the EMT's arrived and transported Hicks to the hospital. [N.T., 10/21/2014 p. 58].

---

[1] See Commonwealth's C-47 Recorded Audio Statement of Kandie Meinhart
[2] The victim was later identified as Rahim Hicks.

Once Hicks was transported to Crozer-Chester Medical Center, Officer Richardson began preserving the scene. Officers located five .380 shell casings as well as one projectile located within the store. [N.T., 10/21/2014 p. 59]. Officer Richardson spoke with Nathan Burrell who was a witness and gave a description of the shooter as: "a light-skinned black male wearing a red and white striped polo shirt and black shorts." [N.T., 10/21/2014 p. 73].

Officer Ernest Manerchia, a twenty-three year officer with the Chester City Police Department in the Crime Scene Unit Investation, was also called to the scene. [N.T., 10/21/204 p. 95]. Now retired, Officer Manerchia's job at the time included responding to crime scenes, collecting physical evidence, and taking photographs. [N.T., 10/21/2014 p. 95]. When Officer Manerchia arrived on scene, patrol officers were there but the victim had already been transported to the hospital. Officer Manerchia was advised that there were numerous pieces of evidence on location. [N.T., 10/21/2014 p.98].

Following his normal routine, Officer Manerchia first photographed the untouched crime scene and then placed numbered markers on each piece of evidence and photographed everything again with the numbered markers visible. [N.T., 10/21/2014 p. 105]. Once the evidence was photographed, Officer Manerchia collected the shell casings so they could be sent to the Pennsylvania State Police Laboratory in hopes of matching the shell casings to the weapon from which they were fired. [N.T., 10/21/2014 p. 107]. In total, Officer Manerchia collected five .380 caliber shell casings with the brand RP on them. [N.T., 10/21/2014 p. 111]. One .380 caliber projectile was located where Officer Manerchia mapped out the victim's body. [N.T., 10/21/2014 p. 112]. One copper jacket was collected from the floor of J&S Seafood. [N.T., 10/21/2014 p. 116].A Samsung cell phone and black baseball cap, located near Hicks' body were also collected as evidence. [N.T., 10/21/2014 p.113].

Officer Jonathan Ross, an eight year veteran of the City of Chester Police Department was also on patrol that evening. After receiving the radio call, Officer Ross followed the ambulance back to Crozer Hospital in order to try and get an identification as well as any information that could be relevant to the investigation. [N.T., 10/21/2014 p. 85]. When Officer Ross arrived at the hospital, he was unable to speak to Hicks because he was being treated; however, he was informed by hospital staff that there was a second victim, a walk-in who was in the lobby. [N.T., 10/21/2014 p. 86]. Officer Ross spoke with the individual, Deron Hudson, who stated that he was inside J&S Seafood when he heard three to four gunshots outside and that he was shot in the left forearm. [N.T., 10/21/2014 p. 89]. Hudson was not able to identify the shooter but he saw Hicks' body as he left the store. Hudson was not on scene by the time police arrived. [N.T., 10/21/2014 p. 89; 10/22/2014 p. 13].

Lieutenant Michael Duffy, of the homicide unit of the Delaware County Criminal Investigative Division, herein CID, was also called to J&S Seafood that evening. Lieutenant Duffy has been in charge of the homicide unit for two years, employed by CID for seventeen years, and prior to that was a police officer for Philadelphia for twenty-five years. [N.T., 10/21/2014 p.327]. When he arrived at J&S Seafood, Lieutenant Duffy had an opportunity to view video surveillance from two cameras inside the store that were monitoring over the cash register and the window where food was passed back and forth. [N.T., 10/21/2014 p. 328]. After viewing the video, Lieutenant Duffy made the determination that the videos offered nothing of any value to the investigation and, as such, he did not take the tapes that evening. [N.T., 10/21/2014 p.330].

Detective James Nolan has been a detective with the City of Chester Police Department for the past five years and with the department for seventeen years. [N.T., 10/22/2014 p. 93]. As

part of his duties, Detective Nolan investigates part one crimes: murder, rape, robbery, auto theft and burglary. [N.T., 10/22/2014 p. 93]. Typically when homicides occur in Chester, the detectives work with other agencies, such as Delaware County CID. [N.T., 10/22/2014 p.94].

Detective Nolan was assigned as lead detective for the shooting at J&S Seafood. Detective Nolan arrived on scene that evening and was briefed by Lieutenant Duffy and Detective McFate. [N.T., 10/22/2014 p. 95]. After viewing the scene and discussing the case, they determined there was one shooter and identified the two victims as Rahim Hicks and Deron Hudson. The officers also relayed the description provided to them of the shooter being a light-skinned black male, wearing a red and white polo shirt and a pair of shorts. [N.T., 10/22/2014 p. 98]. Although Detective Nolan had reports that it was fairly crowded at the time the other officers arrived on scene, no other eye witnesses came forward that night, although this did not surprise him because it is not uncommon in any case to have a lack of cooperation for crimes committed in the City of Chester for a myriad of reasons. [N.T., 10/22/2014 p.103].

On July 25, 2010, the day after the murder, Detective Nolan was informed by a fellow Chester detective, Captain Massey that Kandie Meinhart had information on the J&S shooting and wanted speak with him. [N.T., 10/22/2014 p. 109]. Detective Nolan met with Ms. Meinhart and recorded her statement. Detective Nolan showed Ms. Meinhart a photo array and she identified Appellant as the man she was speaking about, who also goes by "Burgers" or "Mir" [N.T., 10/22/2014 p.112]. During the interview, Detective Nolan noted that Ms. Meinhart did not seem mad at Appellant but she did seem afraid and asked to remain anonymous. [N.T., 10/22/2014 p.110].

Ms. Meinhart told Detective Nolan that her boyfriend, Appellant, Jamir Williams, was supposed to pick her up from work that evening. After he didn't show, she called him. Appellant

answered around 3:00a.m., and said he was at J&S Seafood. Ms. Meinhart could hear Appellant arguing with another male. Ms. Meinhart stated: "the guy told Mir I got something for you" and Mir said You got something for me, well I got something for you" and then she heard the phone drop and a couple minutes later she heard four gun shots go off. She then heard a car door shut and a car quickly pull away. As soon as that happened she hung up the phone and less than ten minutes later, Appellant pulled up in front of her house. She got in the car to talk to Appellant and she asked him what happened. Appellant didn't say anything at first but she looked into the backseat and saw a small black automatic gun. He [Appellant] said: "Yo B, I just did something" to which she responded: "please don't tell me you did what I think you did" and Appellant replied: "I had to. I had no choice but to shoot him." Appellant told Ms. Meinhart that he shot him four times outside of J&S and he believed each bullet hit him. Appellant then answered the phone in Ms. Meinhart's presence and said: "yeah I shot the bull. I had to shoot the bull four times. I'm not gonna let nobody talk to me like that." Appellant also told the person on the phone that he wasn't going to lay low because nobody knows he did it. Appellant got angry with Ms. Meinhart that she wouldn't take the gun into her home. Ms. Meinhart stated that at the time she was with Appellant that evening, he was wearing dark tan cargo pants with red strings, a white v-neck shirt on, and white sneakers but that he always wears a polo to the club. She wasn't sure what club he went to but he did have a stamp on his arm. Ms. Meinhart also told Detective Nolan that Appellant has a tattoo on his arm that says "burgers." Appellant told Ms. Meinhart that "him and the bull were arguing" earlier in the evening but he didn't say what the argument was about and he [Appellant] told her that she better not tell anybody. (See C-47).

Detective Nolan did not initially act on the information provided because he feared that Ms. Meinhart was the only person who knew these intimate details and because of this, even if it

was a sealed search warrant, Appellant would still know that she provided the information and therefore place her in danger. [N.T., 10/22/2014 p. 110]. Months passed before any new information came to light in the case. [N.T., 10/22/2014 p. 112].

On October 5, 2011, Detective Nolan spoke with an Emil Williams, who is also from Chester, Delaware County. Emil Williams was incarcerated on December 15, 2010 on an unrelated case and was speaking with Chester detectives on an unrelated matter. When they were finished, Detective Nolan was alerted that Emil Williams also had information on the shooting at J&S Seafood. [N.T., 10/22/2014 p. 113]. Detective Nolan then spoke with Emil Williams and took a statement from him.

Emil Williams told Detective Nolan that on July 24, 2010, he was at Dixon's bar in Sharon Hill and saw an altercation between Appellant and Rahim Hicks. [N.T., 10/21/2014 p. 152]. Words were exchanged between Appellant and Hicks and Hicks smacked Appellant. [N.T., 10/21/2014 at 153]. After leaving Dixon's Bar, Emil Williams went to J&S Seafood around 3:30a.m., and witnessed another argument between Appellant and Hicks. [N.T., 10/21/2014 p. 148]. Emil Williams was standing by his car but could see the parking lot of J&S. Emil Williams saw Appellant pull out a gun. [N.T., 10/21/2014 p. 159]. Emil Williams turned and started walking closer to his car when he heard gun shots. [N.T., 10/21/2014 p. 151]. In response to the shots, Emil Williams ducked. [N.T., 10/21/2014 p. 151].After giving his statement, Emil Williams selected Appellant out of a photo array as the man he saw with a gun outside of J&S Seafood moments before shots were fired. [N.T., 10/21/2014 p. 153].

After receiving word from his crime scene unit of an IBIS hit, Detective Nolan was instructed to resubmit a particular gun from an arrest of Jashawn Palmer on August 17, 2010 and the evidence from the J&S Seafood shooting of Rahim Hicks for a possible match. [N.T.,

10/22/2014 p.117]. In the meantime, Detective Nolan looked back at the arrest of Jashawn Palmer and realized he was actually working that day. [N.T., 10/22/2014 p. 117]. Palmer was arrested in the area of Rose and Upland during a narcotics situation.[N.T., 10/22/2014 p. 114]. When he was arrested, Palmer had a gun on his person that was later submitted to the laboratory. [N.T., 10/22/2014 p. 115]. Detective Nolan knows the area where Palmer was arrested to be a place for street level narcotics. To protect themselves, but also to avoid being patted down with a weapon on their person, people hide the guns in car tires, bushes, streets, grates, etc. [N.T., 10/22/2014 p.116].

After receiving word of the potential match, Detective Nolan went to Palmer's home to see if he would speak to him but Palmer directed Detective Nolan to his attorney because his case was still open. [N.T., 10/22/2014 p.117]. However, in 2014, after his case was finished and Appellant had been charged, Palmer did speak with Detective Nolan and gave a statement as to how he came into possession of the gun. Palmer told Detective Nolan that it was a neighborhood gun; he just grabbed it from a car tire and was holding onto it when the cops started chasing him and he was caught with it. [N.T., 10/22/2014 p. 118]. Palmer also told Detective Nolan that he had contact with "Burgers" about the gun, who told him that the gun was "dirty" and not to talk about it anymore. [N.T., 10/22/2014 p. 118].

At this point, having Ms. Meinhart's and Emil Williams' statements that corroborated each other, as well as the IBIS hit, the case was presented to the District Attorney's Office for charges to be approved. Appellant was subsequently arrested on February 9, 2012 and taken to police headquarters. [N.T., 10/22/2014 p. 199]. The following morning, Detective Nolan along with Detective Todd Nuttall interviewed Appellant. Appellant gave a recorded statement in which Appellant told Detectives he was an eyewitness to the J&S shooting and that he was

outside the store when he heard a shot come over his shoulder and when he looked he saw "Terrell from the McCaffs" who was dark skinned and had a beard. [N.T., 10/22/2014 p. 126]. Detective Nuttall knew that Appellant was referring to a certain area of Chester when he said McCaff. [N.T., 10/22/2014 p. 136]. Detective Nolan followed up on Appellant's story but found not a scintilla of evidence that supported his account. [N.T., 10/22/2014 p.139].

## PROCEDURAL HISTORY

Initially, the Commonwealth filed a Notice of Aggravating Circumstances, pursuant to Pa. R. Crim. P. 802, making this a capital case.

Michael Wiseman, Esquire, counsel for Appellant, filed an Omnibus Pre-Trial Motion on January 25, 2013. The entire procedural history pertaining to this motion is set forth in detail in this Court's order dated October 10, 2014, which is attached as *Appendix A.*

On June 11, 2014, after a thorough review of numerous records and upon further investigation, the Commonwealth withdrew the Notice of Aggravating Circumstances.

On October 17, 2014, Appellant filed "Defendant's Further Pre-Trial Motions" which addressed parts of Appellant's statement to police that counsel alleged should be redacted. Attached to the motion was a typed transcript of the interview. This Court reviewed the statement and issued an order granting in part and denying in part Appellant's proposed redactions. *See Appendix B*

In addition, the Commonwealth filed a Motion *in Limine* seeking to prohibit Appellant from eliciting particular testimony at trial in regards to Emil Williams and his prior criminal history. This Court issued an order addressing this issue on October 21, 2014. *See Appendix C*

A jury was selected on October 20, 2014. Trial commenced on October 21, 2014, and lasted through October 23, 2014. The Commonwealth presented testimony from Officer Gary

Richardson, Officer Ernest Manerchia, Officer Johnathan Ross, Lieutenant Michael Duffy, Detective James Nolan, and Deron Hudson all of whom testified to the facts as stated above.

In addition, the Commonwealth also presented testimony from Emil Williams, Kandie Meinhart, Jashawn Palmer, Deputy District Attorney Stephanie Wills Esquire, Donald Beese, Corporal Daryl Elias of the Pennsyvlania State Police, and Dr. Frederic Hellman, MD.

Emil Williams testified to the events that he saw the night of July 24, 2010, the statement he gave to police, as well as his plea agreement with the Commonwealth. [N.T., 10/21/2014 p. 158]. Deputy District Attorney Wills testified about the plea agreement with Emil Williams. [N.T., 10/21/2014 p. 215]. Ms. Wills testified that she authorized and prepared the plea agreement with Emil Williams in connection to this case.[3] [N.T., 10/21/2014 p. 218]. Ms. Wills explained that Emil Williams was arrested on a drug case in 2010 and pled guilty to two separate counts of delivery of cocaine. [N.T., 10/21/2014 p. 221]. Ms. Wills explained that Emil Williams was not promised anything in return for his truthful testimony in Appellant's trial, but the Commonwealth would, at the time of Williams' sentencing, explain his cooperation in Appellant's trial. Emil Williams was not promised any particular sentence for his testimony. [N.T., 10/21/2014 p. 222].

Jashawn Palmer testified that on August 17, 2010, he was arrested in the area of Rose and Upland Streets in Chester, Delaware County. [N.T., 10/21/2014 p. 244]. At the time he was stopped by police he was carrying a small black .380 that he took from a wheel on a tire, which is a common place to locate a gun in Chester. [N.T., 10/21/2014 p. 245]. Palmer also testified that while he was incarcerated, he made a call from prison using a different inmate's pin to his mother. [N.T., 10/21/2014 p. 248]. While on the phone, "Burgers," who Palmer identified as Appellant in court, got on the phone and told Palmer that the gun was dirty. [N.T. 10/21/2014 p.

---

[3] The plea agreement was admitted as D-2 and signed on December 19, 2011.

250]. Palmer also testified that he told Detective Nolan all of this when he gave a statement in August 7, 2014. [N.T., 10/21/2014 p. 250].

Kandie Meinhart testified that Appellant is the father of her child and that the two were "messing around" back in July of 2010. [N.T., 10/22/2014 p.26]. Despite playing the recorded statement given to police on July 25, 2010, the night after the shooting, and despite sitting with Detective Nolan prior to trial and reviewing and signing that the statement was accurate, Ms. Meinhart stated that she "didn't remember" telling the police what occurred between her and Appellant on the evening of the shooting. [N.T., 10/22/2014 p. 34]. Ms. Meinhart also testified that she has since visited Appellant in prison and is still close with Appellant's family. [N.T., 10/22/2014 p. 39].

Corporal Daryl Elias, is employed by the Pennsylvania State Police and is currently located at the Lima Regional Crime Laboratory as a forensic and tool mark examiner [N.T., 10/21/2014 p. 275]. At trial, Corporal Elias was qualified and testified as an expert in firearms and tool mark examination. [N.T., 10/21/2014 p. 283]. Corporal Elias received a submission from the Chester Police Department on or about July 24, 2010, that contained five shell casings and one projectile. [N.T., 10/21/2014 p. Corporal Elias also received bullets from the medical examiner's office. Corporal Elias gave a thorough explanation of the examination he conducted. [N.T., 10/21/2014 p. 283-299]. Corporal Elias was also given the firearm confiscated from Jashawn Palmer on August 17, 2010. [N.T., 10/21/2014 p. 301]. Corporal Elias opined that the firearm did discharge the projectiles, bullets, and cartridge cases submitted by the Chester Police Department from the J&S shooting of Rahim Hicks. [N.T., 10/21/2014 p. 306-308].

Donald Beese, an Investigator at George W. Hill Correctional Facility, explained to the jury the booking process each inmate goes through and record keeping system known as OMS.

[N.T., 10/22/2014 p. 162]. Each inmate is given a PIN number to use when they make telephone calls, which are all recorded. [N.T., 10/22/2014 p. 162]. Mr. Beese explained that, although there were no calls placed from Jashawn Palmer's PIN, his mother's number, which he listed during booking was called between August 18, 2010 and August 23, 2010 from another inmate's PIN, which is not uncommon. [N.T., 10/22/2014 p. 168]. The PIN number that called Jashawn Palmer's mother was from another inmate in his cellblock. [N.T., 10/21/2014 p. 168]. The recordings of those phone calls were not available for trial because the request came after the year mark that they are kept. [N.T., 10/22/2014 p. 169]. Mr. Beese also explained that he received a request from the Commonwealth in regards to Appellant's phone calls for the month of February 2012. The Commonwealth played a phone call placed by Appellant on February 12, 2012 at 8:17a.m.,[N.T., 10/22/2014 p.174]. In the phone call, Appellant and his brother are speaking, two days after he gives his statement to police, about "how his lawyer can get all that shit deleted" and strategizing about the name Appellant gave to police. [4]

Dr. Fredrick Hellman testified that he is employed by the County of Delaware as the Medical Examiner and has been so employed for fourteen years. [N.T., 10/22/2014 p. 182]. Dr. Hellman was qualified and testified as an expert in the field of forensic pathology. [N.T., 10/22/2014 p.188]. Dr. Hellman testified that he conducted an autopsy on Rahim Hicks and found four gunshot wounds; one just inside the right nipple, one over the front of the right lower chest, one in the right upper arm and one just about the elbow on his right arm. [N.T., 10/22/2014 p.191]. Based on his autopsy, Dr. Hellman opined to a reasonable degree of medical certainty that the cause of Rahim Hicks death was multiple gunshot wounds and the manner of death was homicide. [N.T., 10/22/2014 p.211]. Dr. Hellman also formed the opinion that the

---

[4] Audio C-57

shots were fired at a very close range, considerably closer than 8-10 inches. [N.T., 10/22/2014 p. 219].

The Commonwealth played the audio of Kandie Meinhart's statement to police (C-47), the audio of Appellant's statement to police (C-51) and the audio of the prison phone calls placed by Appellant (C-57).

The defense presented Detective James Nolan who testified that Appellant paid a visit to the family of Rahim Hicks the morning after the shooting. [N.T., 10/22/2014 p. 230].

On October 23, 2014, Appellant was found guilty of Murder in the First Degree[5] and Possession of an Instrument of Crime[6]. Appellant was originally scheduled to be sentenced on January 15, 2015; however, facing a second homicide trial, this Court, in an abundance of caution, continued the sentencing until the completion of the second homicide trial so that Appellant was not prejudiced by publicity that would certainly arise at that time.[7]

On March 20, 2015, this Court sentenced Appellant on Count 1: Murder in the First Degree to life without parole and on Count 3: Possession of an Instrument of Crime, 30-60 months consecutive to Count 1. In addition, this transcript was to run consecutive to transcript 2378-2012, in which Appellant was also sentenced to life without parole for Murder in the First Degree.

Appellant filed this direct appeal and timely complied with this Court's 1925(b) order. On appeal, Appellant raises the following allegations:

(1) This Court erred in denying his motion to suppress;

(2) This Court erred when denying his "Further Pretrial Motions" which sought to redact portions of Appellant's Statement to Police as follows:

---

[5] 18 Pa.C.S.A. Section2502(a)
[6] 18 Pa.C.S.A section 907
[7] Appellant was convicted in that case of the First Degree Murder of Emerson Price, III.

(a) This Court did not redact the portions of Appellant's statement that contained foul language;

(b) This Court did not redact the portions of Appellant's statement that were hearsay-within-hearsay;

(c) This Court did not redact the portions of Appellant's statement that contained references to prior dealings with law enforcement;

(d) This Court did not redact the portions of Appellant's statement that referenced prior back acts or incarceration;

(e) This Court did not redact the portions of Appellant's statement that infringed on his right to remain silent and to counsel.

(3) This Court erred when it did not permit cross-examination on Emil William's full criminal history and when allowing Emil Williams to testify to a prior consistent statement;

(4) This Court abused its discretion when it allowed a description of the shooter; and

(5) This Court abused its discretion when Detective Nolan was permitted to testify that people were not cooperating with the investigation.

## DISCUSSION

### 1) Appellant's Motion to Suppress was Properly Denied.

Appellant alleges that this Court erred in denying his motion to suppress his statement to police and any pre-trial identifications.

When reviewing a trial court's denial of a motion to suppress, the appellate court must determine whether the suppression court's factual findings are supported by the record. In doing so, the reviewing court must only consider the evidence of the prosecution's witnesses, and so much evidence of the defense that remains ucontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, the reviewing court is bound by such findings, and may only reverse if the legal conclusions drawn therefrom are erroneous. *Commonwealth v. Martin*, 101 A.3d 706, 719 (Pa. 2014).

This Court issued comprehensive findings of fact and conclusions of law on October 10, 2014. For purposes of Appellant's argument that the motion should not have been denied, this Court rests upon the order issued on October 10, 2014, which is attached as Appendix A.

**(2)     This Court Properly Determined all Pre-Trial Issues Pertaining to Appellant's Statement to Police.**

"When reviewing a ruling on a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court and our review is for abuse of discretion." *Commonwealth v. Parker*, 104 A.3d 17, 21 (Pa. Super. 2014). An abuse is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will discretion is abused. *Commonwealth v. Hairston*, 84 A.3d 657, 665 (Pa. 2014).

**A. This Court Properly Denied Appellant's Request to Redact Foul Language.**

Appellant asserts that this Court abused its discretion when it did not redact the foul language in Appellant's statement to police as requested in his "Further Pre-Trial Motions." Counsel alleged in that Motion that the words "shit, "mother fuckers" and "bitches" were irrelevant and should be redacted pursuant to Pa.R.E. Rules 401, 402, and 403.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action. *Pa.R.E., Rule 401*. All relevant evidence is admissible, except as otherwise provided by law. *Pa.R.E., Rule 402*. The Court may exclude evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. *Pa.R.E., Rule 403*.

Appellant's recorded statement is completely relevant and was not unfairly prejudicial. Likewise, the words to which Appellant objects neither confused nor mislead the jury. To the contrary, redacting the words would have completely altered the context of the statement and would have caused it to be disjointed. Consequently, this Court did not abuse its discretion and its decision to permit the objected to language was not manifestly unreasonable.

**B. This Court Properly Determined which Portions of Appellant's Statement Were Hearsay-within-Hearsay and Which Portions Were Not.**

Appellant alleges this Court abused its discretion when it did not redact portions of hearsay-within-hearsay contained in Appellant's statement to police. In his "Further Pre-Trial Motions," Appellant listed the sections that he wished to be redacted; this Court then reviewed the typed copy of the statement which was attached to counsel's motion. This Court agreed with counsel on three portions of the statement, and as such, they were redacted prior to the statement being played at trial. This Court did not agree that eight other lines provided by Appellant should be redacted. The lines contested on appeal are as follows, all of which were spoken by Appellant to Detective Nolan:

> Page 2 Line 18: "You know what I'm saying, people saying my name, I understand that but I know, you say you want the facts."
>
> Page 7: Line 11, 15-16: They just, they just came over there, they were like yo, yo they woke me up, they was like yo people saying you killed, uh I don't even know the guy's name."…. "The guy at J&S, I'm like what? I'm like, nah you got that wrong. He like come tell his family man they over there your name in that shit like do something"
>
> Page 8: Line 12, 22-23: "They lying, but I don't care about that thought I don't care. I know what I seen and who did what to this man. That's supposed to be my family."
>
> Page 13, Line 5: "They said you was out there like you was involved in that shit. I'm like man I didn't do nothing."
>
> Page 20, L: 13-14: "This is what I know, the people that telling you shit, they lying probably trying to help themselves.

Page 25: L11-17: "Q: "I mean does he still currently?"
A: "I don't know, I don't know, I don't deal with them I don't know these people I don't know these people. I know little D and T, they from the neighborhood over there, and step dads."
Q: "little D is your mom's brother's son?
A: "right."

Page 35: L-18: "People got me shot, public opinion, people got me shot."

Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. *Pa.R.E., Rule 802.* Hearsay is defined as a person's oral assertion, written assertion, or nonverbal conduct that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. *Pa.R.E., Rule 801.* Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule. *Pa.R.E., Rule 805.* A statement offered to show its effect on a person's state of mind is not excluded as hearsay. *Pa.R.E., Rule 803(3).*

"It is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth of the matters asserted but rather to show the information upon which police acted." *Commonwealth v. Trinidad,* 96 A.3d 1031, 1037 (Pa. Super. 2014). Furthermore, a police officer's course of conduct is admissible where defense counsel attacks the adequacy of the police investigation and its focus on Appellant rather than on others. *Commonwealth v. Chmiel,* 585 Pa. 889 A.2d 501, 601 (Pa. 2005).

In *Commonwealth v. Dargan,* 897 A.2d 496 (Pa. Super. 2006), the Superior Court held that an informant's statements to police describing the defendant's drug activity was not subject to a Crawford challenge where the statements were offered to explain the officer's investigation.

This Court did not redact the above portions that counsel requested because the statements were not offered for the truth of the matter asserted. The statements that Appellant was making to police were not offered to prove that he was in fact the shooter or that people were saying he shot Hicks. In essence, Appellant was offering the statements to show why he reacted the way he did and why he went over to Hicks' home to clear his name. Appellant contended he was not the shooter and argued at trial that the police did not focus on the name Appellant provided them and rather focused too much on Appellant.

## C. This Court Properly Redacted The Parts of Appellant's Statement That Indicated Prior Dealings with Law Enforcement.

Appellant asserts that this Court did not redact the parts of Appellant's statement that refer to prior dealings with law enforcement. The sole part that this Court did not redact which Appellant requested is as follows: Appellant: "That's what I'm saying I know I know what happened like I told you. You know what I told you, you understand and I know what I told you but I don't like [Detective] Nuttall, the way he did to me and my family you know what I mean. He did us wrong, you feel me, we the key to this case."[8]

When examined within the context with which it was stated and with the entire surrounding conversation, Appellant is speaking about the instant case and not about prior dealings with Detective Nuttall. Furthermore, Appellant never states either directly or indirectly that he had prior dealings with Detective Nuttall because of criminal involvement. As such the statement did not need to be redacted and this Court did not abuse its discretion.

---

[8] Page 8 Line 3 of Defendant's Statement prior to redaction for trial, after redaction, page 7 lines 23-25.

**D. This Court Properly Determined Which Parts of Appellant's Statement to Police Mentioned a Prior Bad Act or Incarceration and Properly Determined Which Statements Did Not.**

Appellant alleges this Court abused its discretion when it did not grant his motion to redact the following from Page 16, Line 24: "I mean like I grew up in Toby Farms in Upland man," because Appellant contends it showed prior incarceration or that he committed a prior bad act.

This Court fails to discern a connection between this innocuous statement and any prior bad act. During this part of the statement, Appellant is discussing areas in which certain people reside. Appellant was referring to Toby Farms, in Chester Township, PA. This does not constitute a prior bad act or imprisonment or infer such. Therefore, this was not abuse of discretion.

**E. This Court Properly Denied Appellant's Request to Redact Portions of his Statement to Police that Appellant Asserts Implicated his Right to Remain Silent.**

Appellant alleges that this Court abused its discretion when it denied his motion to redact portions of his statement where police ask why he didn't come forward with the information that Terrell was the shooter because it violated his privilege against self-incrimination and right to counsel.

"In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person

may be permitted and shall not be construed as compelling a person to give evidence against himself." *Pa. Const. Art. 1, § 9.*

After being advised of his right to remain silent and his right to counsel, Appellant voluntarily waived those rights. Furthermore, in the context with which this exchange takes place, Appellant is offering an alibi by identifying the person he contends he [Appellant] witnessed commit the shooting. There is nothing in this statement that remotely implicates Appellant in the commission of the crime. His statement in and of itself and in the context of the entire exchange is not incriminating. Accordingly, there was no abuse of discretion.

### (3) This Court Properly Determined that Cross Examination of Emil Williams Would Not Include his Entire Criminal History.

Appellant alleges that he should have been allowed to cross examine Commonwealth witness Emil Williams on his entire prior criminal record to show his motivations for entering into a plea agreement and to establish the witness's state of mind and bias.

"For purposes of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement." *Pa.R.E. Rule 609(a.)* If more than ten years have passed since the witness's conviction or release from confinement for it, whichever is later, evidence of that conviction is only admissible if: (1) its probative value substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." *Pa. R.E. Rule 609(b).*

An accused has the right to cross-examine Commonwealth witnesses for his bias stemming from open criminal charges. *Commonwealt h v. Cox,* 728 A.2d 923, 933 (Pa. 1999).

This Court properly determined that counsel for Appellant was free to cross examine Emil Williams with regard to his open criminal case that formed the basis for the plea agreement with the Commonwealth and any criminal convictions in the nature of *crimen falsi* that occurred within the last ten (10) years or for which Emil Williams was still under supervision.

Appellant argues that without going through Emil Williams's entire prior criminal history, conviction by conviction, he could not show his motivation for entering a plea agreement. Where supervision is closed, there is no foundation from which the witnesses could gain leverage by testifying in the instant matter. Thus, the probative value did not outweigh the prejudicial effect.

As allowed by law, Appellant's open criminal case, which was the subject of the plea agreement with the Commonwealth, was available for Appellant to cross examine on and in fact, counsel for Appellant clearly elicited that testimony from Emil Williams. Furthermore, when the witnesses stated that his sentence for the open case could increase because of his "jacket," this Court allowed counsel to explore the possible sentence Appellant could face. [10/21/2014 p. 167-168]. The jury heard the testimony that Emil Williams was part of a plea agreement and they were free to determine whether that made Emil Williams a credible witness and free to determine Emil Williams motivation for entering into the plea agreement.

Additionally, Appellant argues that this Court abused its discretion when it allowed Emil Williams to testify on re-direct that he identified Appellant as the shooter at the preliminary hearing.

"Prior consistent statements are admissible to rehabilitate a witness's credibility and to rebut accusations or suggestions of recent fabrication or corrupt motives." *Commonwealth v. Murhpy,* 657 A.2d 927, 933 (Pa. 1995) (The trial court's admission of a witness's prior

preliminary hearing testimony in order to rebut the defense's inference of recent fabrication and to rehabilitate the witness was proper).

This Court did not abuse its discretion as counsel for Appellant attacked Emil William's credibility on cross and the Commonwealth was rehabilitating its witness. This was fair rebuttal given defense counsel's cross-examination.

**(4)    This Court Did Not Abuse its Discretion by Allowing Officer Richardson and Detective Nolan to Testify as to the Description of the Shooter Provided by Nathan Burrell.**

Appellant alleges that this Court abused its discretion by allowing Officer Richardson and Detective Nolan to testify to the description provided by on scene witness Nathan Burrell that the shooter was "a light skinned male wearing a red and white striped polo shirt and black shorts" Appellant also alleges this testimony was improper hearsay.

"It is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth of the matters asserted but rather to show the information upon which police acted." *Commonwealth v. Trinidad,* 96 A.3d 1031,1037 (Pa. Super. 2014).

This Court properly admitted the testimony because it was not offered for the truth of the matter asserted; rather, the testimony was offered to explain the course of conduct taken by on-scene officers. In addition, this Court gave a cautionary instruction to the jury that the testimony was not being offered for the truth; rather the testimony was being offered to show information provided to police during the on-scene investigation. Therefore, this Court did not err in allowing the testimony at trial.

**(5)     This Court Did Not Abuse its Discretion when it Permitted Detective Nolan's Testimony.**

Appellant alleges that this Court abused its discretion when it permitted Detective Nolan to testify that although he was aware of reports that it was crowded on the evening of the shooting, that no witnesses initially came forward and even though he spoke with some witnesses in the following days, they refused to cooperate. Furthermore, Appellant alleges this violated his right to confront witnesses as secured by the Sixth and Fourteenth amendments to the United States Constitution and Article I Section 9 of the Pennsylvania Constitution, as well as the statement being hearsay.

Detective Nolan's description of the information he received regarding potential witnesses, the action he took in attempting to speak with these potential witnesses in order to gather information, and the fact that no one would provide information is not non-verbal hearsay. There is nothing within the context of this statement that conveys an assertion that Appellant was involved in the shooting or even was at the scene, nor is it being offered to prove the truth of the mater, i.e., people would not talk. The sole purpose was to demonstrate that there were numerous persons at the scene at the time of the incident in order to rebut the contention that the police were inept in their investigation and failed to pursue Terrell, who Appellant contended was the actual shooter. Therefore, Detective Nolan's testimony was purely descriptive of this aspect of his investigation, did not implicate Appellant in any manner and he was cross-examined by Appellant's counsel on this issue. Thus, there was no error of law or abuse of discretion.

**CONCLUSION**

Appellant's issues are without merit, and as such, Appellant's judgment of sentence should be affirmed.

BY THE COURT:

_____
John P. Capuzzi, Sr.                    J.

*Appendix A*

ORIGINAL

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | **CP-23-CR-3302-2012** |
| **V.** | |
| **Jamir Williams** | |

## ORDER

**AND NOW**, to wit, this 10th day of October 2014, upon consideration of

Defendants' **OMNIBUS PRETRIAL MOTION** and the hearings held on July 31, 2014,

September 4, 2014, September 11, 2014, and September 16, 2014, it is hereby

**ORDERED** and **DECREED** that Count 1: Dismissal of Charges Based on Delay in

Prosecution; Count 3: Suppression of Defendant's Statements; and Count 5:

Suppression of Pre-Trial Identification are **DENIED.** All other Counts have previously

been addressed by this Court.

## PROCEDURAL HISTORY

Defendant is charged with murder and related offenses in the shooting death of Rahim Hicks and the wounding of Deron Hudson that occurred on July 25, 2010 at J & S Seafood, 836 Kerlin Street in the City of Chester, Pennsylvania. Defendant was arrested on these charges on February 9, 2012. Initially, the Commonwealth filed a *Notice of Aggravating Circumstances,* pursuant to Pa. R. Crim. P. 802, making this a capital case; however, on June 11, 2014, after a thorough review of numerous records and upon further investigation, the Commonwealth withdrew the above notice.

Michael Wiseman, Esquire, counsel for the defendant, filed an Omnibus Pre-Trial Motion on January 25, 2013. Said Motion, at the request of the Commonwealth and the defendant, was held in abeyance pending the receipt of various records and the exchange of discovery. The Motion requests relief as follows:

I.      Dismissal of Charges Based on Delay in Prosecution;

II.     Inspection of Evidence;

III.    Production of Statements Made by Mr. Williams/ Suppression of Statements;

IV.     Production of Witness Statements;

V.      Suppression of Pre-Trial Identification;

VI.     Identification of Consideration Provided To or Contemplated for Commonwealth Witnesses;

VII.    Motion to Compel Discovery;

VIII.   Production of All Exculpatory Evidence;

IX.     Appointment of Fact Investigator; and

X.      Reservation of Other Motions.

The suppression hearing commenced on July 31, 2014 at which time Assistant District Attorney Sandra Urban, Esquire, advised the Court that all discovery has been produced in a timely manner and that the Commonwealth will continue to do so. ADA Urban also informed the Court that the District Attorney has an open records policy and that defendant's counsel can make an appointment to inspect the DA's file. The Commonwealth stated that all statements obtained have been provided to defendant. As to exculpatory evidence, the Commonwealth has averred that it has complied with *Brady v. Maryland*. The Court previously did appoint an investigator to assist defense counsel. Therefore, those issues are denied as moot.

The issues that remained outstanding were the alleged delay in prosecution[1], the voluntariness of defendant's statement to police, the use of the photo arrays for the identification of defendant, and the identity of any witnesses who have been granted consideration by the Office of the District Attorney and the terms of the consideration. At the hearing on July 31, 2014, the Commonwealth produced testimony from Detective James Edward Nolan, IV, City of Chester Police Department, Thomas Omlor, Supervisor of Juvenile Probation and custodian of records for the department, James Hardy, bail interviewer, and Corporal Michael Daly of the

---

[1] On July 31, 2014, the first listing of the suppression hearing, counsel for the Commonwealth and counsel for Defendant agreed that the delay in prosecution argument was a pre-arrest delay argument and not a Rule 600 motion. [N.T., 7/31/2014, p. 8 vol. 1].

Chester Township Police Department. The hearing was continued due to the unavailability of Detective Todd Nuttall.

On Thursday, September 4, 2014, the suppression hearing continued. Two stipulations were entered on the record. Detective Todd Nuttall testified and then the Commonwealth rested. Defense Attorney Wiseman presented the testimony of Gerald Cooke, Ph.D. Dr. Cooke's direction examination was completed and the hearing was continued to September 11, 2014 to begin the cross-examination.

On Tuesday, September 16, 2014, Captain Blair of the City of Chester Police Department appeared in court in response to a subpoena issued by Michael Wiseman, Esquire, counsel for the defendant. Mr. Wiseman advised that Captain Blair informed him that there were no records responsive to the subpoena and Mr. Wiseman advised the Court that there was no need for testimony from Captain Blair. Defendant marked and entered DS-12 (High School Transcript) and DS-13 (Pg. 33 of the DSM-5 (Intellectual Disability). The defense rested. In rebuttal, the Commonwealth produced CS-38 (Audio of Guilty Plea, 1/31/08) and CS-39 (Guilty Plea Statement and Statement of Post-Sentence Rights) and then rested. Counsel agreed that the Court could listen to the audio tape in chambers.

Counsel was instructed to provide the Court with Memorandums of Law by September 30, 2014, which was later extended until October 3, 2014.

# FINDINGS OF FACT

**Sworn Testimony of Detective James Nolan:**

1. On July 24, 2010 a shooting occurred at J & S Seafood located near 9th and Kerlin Street, City of Chester, Pennsylvania. J & S Seafood is a fast-food establishment that is usually open late at night. [N.T., 7/31/2014 p. 26 vol. 1].

2. Detective James Nolan was the detective assigned to lead the investigation. [N.T., 7/31/2014 p. 26].

3. Detective Nolan has been employed by the City of Chester Police Department for seventeen years including five years as a patrolman and as a detective since 2005. [N.T., 7/31/2014 p. 23 vol. 1].

4. As a Detective, Nolan primarily focuses on Part I crimes, murder, rape, robbery, etc.[N.T., 7/31/2014 p. 24 vol. 1].

5. The assignment for homicide cases is made by the Captain and it is done on a rotating basis within the detective division and Detective Nolan was next up in the rotation. [N.T., 7/31/2014 p. 24- 26 vol. 1].

6. Detective Nolan has been the lead detective on approximately 40 homicide cases and assisted on around 200 homicide cases. [N.T., 7/31/2014, p. 25 vol. 1].

7. Detective Nolan was not on duty at the time of the shooting, as his usual shift is 8:00 a.m. to 4:00 p.m. but was called in that night and arrived on the scene a couple of hours after the shooting. [N.T., 7/31/2014 p. 25-27 vol.1].

8. Detective Nolan was briefed by the two detectives who were on the scene who informed that Rahim Hicks had died on the scene and that Deron Hudson suffered non-fatal injuries. [N.T., 7/31/2014 p. 27-28 vol. 1].

9. Detective Nolan was assisted by Delaware County CID (Criminal Investigation Division) and other Chester police officers. [N.T., 7/31/2014 p. 28 vol. 1].

10. Detective Nolan's investigation began with an examination of the crime scene, interviews, and evidence collection. Detective Nolan began to develop a suspect by the name of "Burgers" through word on the street and phone calls and when he ran the name "Burgers" through the Chester PD examining report writing system, he received the defendant's name, Jamir Williams. [N.T., 7/31/2014 p.29-31, vol. 1]. Detective Nolan is aware that defendant Jamir Williams has a tattoo that says: "Burger." [N.T., 7/31/2014 p. 89 vol.1].

11. The following day, July 25, 2010, Captain Massi advised Detective Nolan that a witness by the name of Candy Minehart had come forward and wanted to speak with him. Ms. Minehart identified herself as defendant's girlfriend and had intimate knowledge and details of the shooting, such as; she was on the phone with the defendant at the time of the shooting and that defendant later confided in her about the shooting. Additionally, Minehart said that defendant went to his brother's house after the shooting. [N.T., 7/31/2014 p.32 vol. 1].

12. A color photo array was developed by using JNET and CPIN. (CS-9). The color array containing eight photos of black males within the range of defendant's date of birth and similar characteristics (all had facial hair) was shown to Minehart, who immediately, and without coercion, picked the defendant and then dated and initialed a black and white copy of the photo array. (CS-10). The photo array was only for confirmation that the witness knew "Burgers." [N.T., 7/31/2014 p. 35-38 vol. 1].

13. Detective Nolan testified that he did not obtain a search warrant at that time because he did want to expose the witness as he was concerned for her safety. [N.T., 7/31/2014 p.33 vol.1].

14. As of July 25th, Minehart was the only witness with regard to this case. [N.T., 7/31/2014 p. 33-34 vol.1].

15. Detective Nolan testified that the District Attorney's approval is needed for a criminal complaint to be filed for murder and he did not believe there was sufficient evidence to arrest defendant based on Minehart's statement alone. [N.T., 7/31/2014 p. 41 vol.1].

16. On October 30, 2010, there was a second homicide in Chester involving a victim named "Memphis." [N.T., 7/31/2014 p. 39-40 vol.1 ]. That case was being handled by Detective Boswell and defendant was identified as a suspect and thus, a dual investigation began.

17. On April 13, 2011, Aaron Jones requested to speak with the cops and was interviewed by Detective Nolan and Detective Jay of CID at CID headquarters. Jones told Detective Nolan he was familiar with the defendant. [N.T, 7/31/2014 p. 40-41 vol.1]. Jones was shown the photo array and identified "Burgers" and signed the photo array. (CS-11).[N.T., 7/31/2014 p. 43-44 vol. 1].

18. At the time of the interview, Jones had charges pending against him and because of this Detective Nolan classified Jones a "polluted witness;" however, Jones volunteered to speak and did not ask for consideration at the time of the interview. [N.T., 7/31/2014 p. 46 vol. 1].

19. Detective Nolan did not move forward with seeking defendant's arrest based only on the testimony of defendant's girlfriend and someone who was facing criminal charges. [N.T., 7/31/2014 p. 46 vol. 1].

20. At some point, bullets and shell casings collected from the scene were sent to the State Police to be run through the IBIS system and a "hit" was received, which provides a preliminary match. The evidence was then presented to a tool mark examiner who determined that the weapon in the Hicks murder was found in the possession of a Jashawn Palmer; however, Detective Nolan confirmed that the police are not actively looking for Jashawn Palmer. [N.T., 7/31/2014 p. 46-48 vol. 1].

21. On October 5, 2011 another person, Emil Williams, requested to speak to the police about the shooting and was interviewed by Detective Nolan and Detective Jay at CID stated that he knew the defendant and provided intimate details of the shooting as an eyewitness. Williams was also shown a photo array, this one created by CID using the same system and confirmed the identity of the defendant and signed and dated the array. (CS-12). [N.T., 7/31/2014 p. 50-54 vol. 1].

22. The original color photo array could not be located, but a copy can be regenerated by the detective who compiled the original. The line-up report from the search criteria used to generate the photo array was admitted. (CS-13). [N.T., 7/31/2014 p. 51-53 vol. 1].

23. Detective Nolan testified that after Emil Williams' statement he believed there was sufficient evidence to charge the defendant. [N.T., 7/31/2014 p. 55 vol. 1].

24. Detective Nolan was thoroughly cross-examined by defense counsel. [N.T., 7/31/2014 p. 58-89 vol. 1 p. 94-119 vol. 2].

25. On cross examination, Detective Nolan testified that between Emil Williams' statement on October 5, 2011 and the complaint and affidavit filed on February 6, 2012, there was nothing new in the case and that he was waiting for the approval of the DA. He believes he had conversations with ADA Stephanie Wills during that time, but does not have notes of those conversations. [N.T., 7/31/2014 p. 58-60 vol. 1].

26. Emil Williams also has a criminal record and to Detective Nolan is a tainted witness, which he believes requires more scrutiny of the witness's statement. [N.T., 7/31/2014 p. 76, 79 vol. 1].

27. A search warrant was executed on July 12, 2012 for cell phone records for defendant's two cell phones. (DS-1). The response from the carrier was that the records were purged. (DS-2). [N.T., 7/31/2014 p. 82, 87 vol. 1].

28. Defendant was arrested on February 9, 2012 after a warrant was issued for his arrest. [N.T., 7/31/2014 p. 29 vol. 2]. Detective Nolan and Detective Nuttall interviewed Defendant the next day, February 10, 2012, at approximately 11:00 a.m. at Chester PD headquarters. This was a custodial interview in a room that was approximately 6 feet by 8 feet and which contained a table and chairs. The room did have an exterior window which provided natural light. [N.T., 7/31/2014 p. 29, 34 vol. 2].

29. Detective Nolan read defendant his *Miranda* rights, one by one, from the form used by Chester PD. Detective Nolan recorded defendant's answers (all Yes) and after each one the defendant was given the form to read and the defendant initialed each paragraph. The *Miranda* form number at the top specifically references the Hicks murder and was signed by the defendant at 11:05a.m. (CS-17). [N.T., 7/31/2014 p. 40-49, 107 vol. 2].

30. Defendant never requested an attorney. [N.T., 7/31/2014 p. 107 vol. 2].

31. There were no conversations with the defendant prior to him being *Mirandized* and the defendant had a normal demeanor and was not upset or crying. Furthermore, the defendant gave no indications of any behavior or comprehension problems. [N.T., 7/31/2014 p. 37-39, 51 vol. 2].

32. Prior to obtaining a tape recorded statement from the defendant, the detectives interviewed the defendant for nearly two hours, hereinafter, the initial interview. Detective Nolan took notes of the initial interview, but destroyed these after the statement of defendant was recorded (memorialized). Many things were discussed and the detectives inquired into who shot defendant two different times, as well as the J & S murder. [N.T., 7/31/2014 p. 11, 52, 56 vol. 2].

33. The recorded statement (CS-18), although of poor quality, was played and a transcription of that statement was provided (CS-19). [N.T., 7/31/2014 p. 56-103 vol. 2].

34. At the beginning of the tape, Detective Nolan reminds defendant that he was given his *Miranda* rights, but they were not re-read to the defendant. Defendant does not request a lawyer, nor does he indicate that he wants to stop talking; however, he does state that he doesn't want to criminalize himself, but then goes on to state that he does feel comfortable talking to Detective Nolan. [N.T., 7/31/2014 p. 56, 61, 107 vol. 2].

35. Defendant does say that he was outside J & S having a cigarette at the time of the shooting and that he saw it. He said he dropped his cigarette when he heard the shots, but then picked it up and took off. [N.T., 7/31/2014 p. 91-92 vol. 2].

36. Defendant provided the name of "Terrell" from McCaffery Village as the shooter, but could not provide a last name or any additional identifying information and when Detective Nolan ran "Terrell" from McCaffrey Village through the reporting writing system, nothing came back and nothing materialized from his further investigation. Detective Nolan only told the defendant that he believed him about "Terrell" in order to keep him talking during the interview.[N.T., 7/31/2014 p. 71-72, 106-107, 127-129 vol. 2].

**Sworn Testimony of Thomas Omlor**

37. Mr. Omlor has been the juvenile court probation and administrative caseload supervisor for Delaware County since 2006 but has been with the courts since 1999. In his capacity as juvenile court probation supervisor, he is responsible for approximately fifty juvenile probation officers. [N.T., 7/31/2014 p. 6-11 vol. 2].

38. Mr. Omlor was defendant's probation officer between 1998 and 2002. Mr. Omlor produced the defendant's juvenile court record and petitions, (CS-14) and a certified copy of the case docket history, (CS-15) which shows that between March 26, 1999 and December 20, 2002, defendant was adjudicated delinquent eight times. While Defendant did participate in the adjudications, from the records, Mr. Omlor can't tell if he understood the process. [N.T., 7/31/2014 p. 8-11, 11-24 vol. 2].

39. Defendant's cases were closed on September 24, 2004 because he was in jail. [N.T., 7/31/2014 p. 19 vol. 2].

## Sworn Testimony of Thomas Hardy

40. Mr. Hardy has been employed by the County of Delaware as a bail interviewer for thirty-four years. [N.T., 7/31/2014 p. 136-137 vol. 2].

41. Mr. Hardy uses a bail interview form to get information to assist the judge. Mr. Hardy produced the bail interview form for defendant dated February 10, 2012. (CS-21). Defendant stated that he had ADHD, went to the 11th grade, but did obtain his GED and that his nickname is "Burgers." [N.T., 7/31/2014 p. 137-140 vol.2].

42. Mr. Hardy did not verify the information defendant provided but Defendant signed the form acknowledging his truthfulness in the information provided [N.T., 7/31/2014 p. 141-142 vol. 2].

## Sworn Testimony of Cpl. Michael Daly

43. Cpl. Daly has been with the Chester Township Police Department for over 29 years and has known the defendant since he was a toddler, as well as the defendant's whole family, and has had many conversations with the defendant over the years. [N.T., 7/31/2014 p. 145 vol. 2].

44. Cpl. Daly did investigate the murder of defendant's brother. [N.T., 7/31/2014 p. 147 vol. 2].

45. Cpl. Daly never knew defendant to have any glaring disabilities. [N.T., 7/31/2014 p. 147-148 vol. 2].

46. Cpl. Daly did investigate a robbery next door to defendant's grandmother's house, in 2003 and arrested the defendant for the crime. When he interviewed the defendant, he did review the Waive of Rights Form (Miranda) with the defendant, which the defendant signed. (CS-22) [N.T., 7/31/2014 p. 148-149, 150-155 vol. 2].

## Stipulations Entered on September 4, 2014:

**CS-23:** booking information sheet from George W. Hill Correctional Facility dated February 10, 2012 and that testimony of Emmanuel Asante from GWHCF, as custodian of records, would authenticate the document.

**CS-24:** this is the original color photo array used by Detective Nolan which corresponds to the black and white copy presented by Detective Nolan during his testimony and which was marked as CS-12.

## Sworn Testimony of Detective Todd Nuttall

47. Detective Nuttall has been employed by the City of Chester Police Department for almost 25 years, the last fourteen of which have been as a detective where his duties include interviewing witnesses, persons of interest and suspects. He has been the primary detective on forty-two or forty-three homicide cases and has assisted on another two to three hundred. [N.T., 9/4/2014, p. 11-13].

48. He customarily *Mirandizes* those who are persons of interest or suspects and has done hundreds of these, including hundreds where the persons waived their Miranda rights and hundreds where the persons refused to waive those rights. [N.T., 9/4/2014, p. 13-14].

49. As the Defendant contends that he could not knowingly, voluntarily, and intelligently waive his *Miranda* rights and, as the defense has provided to the Commonwealth the report of Dr. Gerald Cooke to support this contention, Detective Nuttall testified as to his previous encounter with Defendant in a criminal case and Defendant's waiver of his *Miranda* rights in that matter and did identify Defendant in court.[ N.T., 9/4/2014, p. 15].

50. On July 30, 2004 he was assigned to assist the detective division in the investigation of the shooting of Hassir Boulware, which occurred in the 100 block of 23rd Street. On October 14, 2004, as a result of the shooting, Jamir Williams and his brother, Harry Tyler, among others were arrested. [N.T., 9/4/2014, p. 15-17].

51. With regard to *Miranda* warnings, Detective Nuttall testified that it is long standing practice for him, using the Chester PD form, to read the rights to the person, to check off the person's response, then give the form to the person to read himself or herself, have the person initial each of the paragraphs and the has each person read aloud the paragraph that states "can you read and understand the English language?" On October 14, 2004, he followed above procedure with Defendant. [N.T., 9/4/2014, p. 19].

52. The *Miranda* waiver of rights form which was executed at that time by Defendant was presented and admitted. Defendant initialed each paragraph and signed the document affirming that information provided in the attached statement is true and correct. (CS-25). Defendant had no questions about the document, nor did he request a lawyer. [N.T., 9/4/2014, p. 17-24].

53. The transcript of the statement Defendant provided, which was also recorded, was marked and admitted. (CS-26: transcript and CS-27: audio cassette). [N.T., 9/4/2014, p. 24-42].

54. On cross-examination, Detective Nuttall acknowledged that Defendant had an attorney at the time he gave the statement, but that he spoke with the attorney prior to the interview and while she could not be there, she agreed they could talk do Defendant. The attorney spoke with Defendant prior to the interview and advised him to talk to the

detectives. Defendant said he wanted to cooperate and gave a new statement which was recorded and then transcribed. (CS-28: transcript and CS-29: audio cassette). [N.T., 9/4/2014, p. 96-97].

55. Defendant then entered into a plea agreement and testified at trial for the Commonwealth resulting in the conviction of two individuals. [N.T., 9/4/2014, p. 43].

56. Detective Nuttall subsequently testified as to his involvement in the interview of Defendant in the current matter, the homicide at J & S Seafood. Detective Nuttall testified that Detective Nolan was the lead detective and conducted the interview. His role was to more or less sit back and listen to Detective Nolan and Defendant. [N.T., 9/4/2014, p. 46].

57. A pre-interview, that is, an interview prior to the recorded statement being made, was conducted which lasted for over one and three quarter hours. The reason pre-interviews are conducted is because people typically go on for hours with lies before they tell the truth, so it is easier to let the person get to the truth before recording the interview. Detective Nuttall does not have any notes from the pre-interview. [N.T., 9/4/2014, p. 49-51, 91-92].

58. Detective Nuttall was present during the *Miranda* warnings when they were read out loud; when defendant acknowledge "yes" to each paragraph; when Detective Nolan asked defendant to read the document himself; when read paragraph #5 out loud; and when defendant signed the statement.[N.T., 9/4/2014, p. 47-49].

59. Defendant's demeanor seemed fine to him; Defendant didn't struggle with reading the document and didn't have any questions; and Defendant did not appear to be under the influence of anything. In addition, Defendant was not coerced or threatened and was never told "if you don't talk, you'll spend the rest of your life in prison." [N.T., 9/4/2014, p. 49, 51-52].

60. Defendant never asked to stop the interview and wasn't crying or expressing mental problems but he did recall Defendant being uncomfortable with him being there so there were times when he (Nuttall) left the room.[N.T., 9/4/2014, p. 52, 56, 58].

61. Detective Nuttall was the lead investigator in the homicide of Walisha Foreman in which he believed Defendant may have some information, because Defendant was implicated by somebody. This homicide is uncharged and unrelated to J & S Seafood homicide. On February 10, 2012, Defendant, following the waiver of his *Miranda* rights, provided a statement regarding the Foreman homicide. The redacted transcript of that statement was provided (CS-30) and portions of the audio were played in court. (CS-31: audio cassette). [N.T., 9/4/2014, p. 60-65].

62. Detective Nuttall also testified as to recorded prison telephone calls to which he listened. The Commonwealth presented the transcript of these. (CS-33). On a call between Defendant and his brother on February 12, 2012, there is a discussion on how to get the statement suppressed. The tactic defendant will employ is that he didn't **understand or comprehend** nothing you all saying, cause I got a mind of a child. (Emphasis added). Defendant also states that "I'm gonna tell them like, listen man, like I can't read, write, or comprehend nothing you all say." [N.T., 9/4/2014, p. 67-80].

63. That same day, on a second call to an unidentified female, Defendant asks the female to write to him and inquires whether she has read the newspaper article yet. On February 14, 2012, in a conversation with his brother there is talk of defendant sending a letter. On February 16, 2012, in conversation with Markeyana Ross, asks for a soft back book and on February 17, 2012, in a conversation with his brother, defendant asks for some soft back books and a Quran. [N.T. 9/4/2014, p. 80-85].

**Sworn Testimony of Gerald Cooke, Ph.D.**

64. Dr. Cooke was presented on behalf of the defendant [N.T., 9/4/2014, p.105-108 & 9/11/2014 p.8-148].

65. Dr. Cooke is a licensed psychologist who practices clinical and forensic psychology and was admitted as an expert in these areas in this matter. [N.T., 9/4/2014, p.105-109].

66. Dr. Cooke prepared a written report, marked as DS-3 and his curriculum vita was marked as (DS-4). [N.T., 9/4/2014, p. 107].

67. Dr. Cooke was present for the testimony of the Commonwealth's witnesses.

68. In his report, Dr. Cooke opined that defendant lacked the mental capacity to knowingly and intelligently waive his *Miranda* rights, although he did not dispute that defendant's waiver was voluntary. To this end, he stated that "While, when these are presented to him verbally, he does have a basic understanding, the primary deficit is his inability to reconcile the concept of Right to Remain Silent with his belief that if law enforcement and/or a Judge tells you that you have to talk then you do have to talk." (Report p. 18).

69. Dr. Cooke opines that "regarding adaptive abilities, defendant is impaired across a wide range of adaptive abilities which, along with the low IQ score, meets the criteria for Intellectual Disabilities." (Report p. 13). [N.T., 9/4/2014, p. 44-148].

70. Dr. Cooke's opinion is based on the history he obtained from the defendant, the records he reviewed, the tests he administered and his clinical impression. [N.T., 9/4/2014, p. 144-145].

71. Dr. Cooke was retained to for the purpose of determining whether the defendant was able to understand his *Miranda* rights and to give a knowing, intelligent and voluntary waiver. [N.T., 9/4/2014, p.110].

72. As part of the evaluation, Dr. Cooke looked a wide range of records, *inter alia*, DOC records, Chester Upland School District records, as well as various reports from other professional evaluations. The full description of records reviewed is contained in 14 paragraphs on pages 2, 3 and 4 of his report. [N.T., 9/4/2014, p. 110 – 111].

73. Dr. Cooke conducted an intellectual-psychological evaluation of the defendant on June 30, 2014 at the George W. Hill Correctional Facility, which included the administration of various tests: namely, the Minnesota Multiphasic Personality Inventory -2 Restructured Form (MMPI-2-RF); Conners Adult ADHD Rating Scales (CAARS-S:S); Wechsler Adult Intelligence Scale – IV (WAIS-4); Wide Range Achievement Test-4 (WRAT-4); Instruments for Assessing, Understanding and Appreciation of Miranda Rights and appraised defendant's adaptive functioning utilizing the DSM-5 criteria. [N.T., 9/4/2014, p. 111 – 113].

74. Dr. Cooke testified that he was unable to administer some of the tests as required. The MMPI -2-RF could not be validly administered to him because of his reading disability, which required him to discuss items with the defendant. The Connors Adult ADHD Rating Scale also was administered verbally because of his reading disability. Likewise, the Wide Range Achievement Test which is the most widely used of the academic tests for reading and sentence and sentence comprehension was read to him. [N.T., 9/4/2014, p.112].

75. There was no testimony that defendant attempted the tests in their basic form and was unable to either perform the tests or could not complete the tests.

76. The Court did examine Instruments for Assessing, Understanding and Appreciation of *Miranda* Rights. [N.T., 9/4/2014, p. 156].

77. Of the records reviewed, some go back to 1994 when defendant was in 2nd grade. [N.T., 9/4/2014 p.115].The specific records reviewed are as follows: Psychological Evaluation by Dr. Del Amo on 9/15/94 (DS-6); Psychological Evaluation by Louis Cataldo, M.A. on 12/19/00 (DS7); DCIU IEP dated 12/18/01 (DS-8); Psychological Assessment Report by Sharon Miller 3/5/08 (DS-9); Psychological Evaluation by Sally Shanahan completed on 3/12/99 (DS-10); and Bureau of Disability Determination by Karen Saporito, Ph.D. on 1/3/10 (DS-11).

78. On direct, counsel asked about his earlier testimony wherein he stated some of the tests were not valid in the sense that you could not rely on the scoring, Dr. Cooke replied: "When a test purports to measure something, validity asks does it measure what it

purports to measure. [N.T., 9/4/2014, p. 116]. Dr. Cooke replied that taking the MMPI-2 for example, when you get a high score on depression, there are other independent criteria that indicate the presence of depression. [N.T., 9/4/2014, p.116-117]. This response does not answer the question as to why the tests could not be administered validly to the defendant.

79. Malingering is deliberately trying to present oneself as either suffering from a problem one doesn't have or pretending that one is less intelligent and is able to read less well than one is. In the WAIS-IV test there are some internal checks and there is no indication that defendant was malingering. [N.T., 9/4/2014, p.117]. His conclusion was that defendant was not malingering. [N.T., 9/4/2014 p. 120].

80. Dr. Cooke noted that over the years has been diagnosed as probably eight or nine times as mentally retarded (now intellectually disabled) and the standardized IQ tests he reviewed or administered range from 53 to 75. [N.T., 9/4/2014, p. 117-118].

81. Regarding IQ tests, 75% of the population falls between 90 and 109 and when you get down to 65, the individual is less intelligent than 99 out of 100 people. [N.T., 9/4/2014, p. 120-121].

82. There is a second component to the diagnosis of intellectual disability, which is adaptive ability – day-to-day functioning. The current thinking is that adaptive disabilities are weighed even more strongly than the IQ. [N.T., 9/4/2014, p. 121].

83. Dr. Cooke also examined "adaptive functioning" as defined in the DSM-5. There are three spheres: Conceptual Domain, Social Domain and Practical Domain. [N.T., 9/4/2014 p. 122-123].

84. Conceptual domain has to do with planning, abstract thinking, memory, academic skills, money management and things of that nature. [N.T., 9/4/2014, p. 122-123].

85. Social domain has to do with the nature and interaction with others, the ability to pick up social cues, the ability to control one's behavior in social relationships, the ability to understand risks, the ability to communicate with others and understand their communication, whether or not the person can easily be manipulated or is gullible, and money management to some extent. [N.T., 9/4/2014, p. 123].

86. Practical domain has to do with personal care like showering, brushing teeth, grocery shopping preparing foods, ability to travel, whether by car or bus or whatever, medical needs, etc. These practical day-to-day issues are now being given even more weight in defining intellectual disability, but still need an IQ below 70. [N.T., 9/4/2014, p. 123].

87. Defendant has previously been diagnosed with learning disability and the primary problem appears to be reading and communication. [N.T., 9/4/2014, p. 124]. He has

also been diagnosed with attention deficit hyperactivity disorder (ADHD), persistent depressive disorder, which is mild in defendant, and pretty dependent on marijuana use. [N.T., 9/4/2014, p. 125-126].

88. In response to just about every question posed by Dr. Cooke to the defendant, the defendant states that he relies upon his mother to tell him what to do. Dr. Cooke then states that "the more you investigate the relationship with his mother, his brothers --one of them died—and his sister, what you see is a pattern in the family where they all help him." [N.T., 9/4/2014, p. 126-127].

89. When questioned by the Court regarding his testimony about defendant reliance upon his mother, sister and brother to perform certain functions for him, Dr. Cooke stated that this was based in part on what defendant told him and in part on assumptions or inferences he made. [N.T., 9/11/2014, p. 145].

90. The Wechsler Intelligence Scale for Children administered to defendant in the second grade resulted in a verbal IQ of 67 and Full-Scale IQ of 62, which Dr. Cooke stated is generally considered mild mental retardation. (DS-6) [N.T., 9/4/2014, p. 134]. Typically, the standard error of measurement is plus or minus 3.5 points. [N.T., 9/4/2014, p. 135-136]. Dr. Cooke, in the test he administered has the Full-Scale IQ at 53. [N.T., 9/4/2014, p. 134].

91. There was also another test included in the records which also showed verbal IQ at 67 and Full-Scale IQ at 62. (DS-8) (Bates page 315) [N.T., 9/4/2014, p. 138].

92. The BETA test records show an IQ of 75, but Dr. Cooke contends this is not acceptable for purposes of defining intellectual disability. (DS-9) [N.T., 9/4/2014, p. 138-139].

93. The Vineland Instrument, not administered by Dr. Cooke but contained in the records, and administered to defendant while incarcerated presents a problem, because the person often represents that he can do things that he is not able to do and it would have been best to sit down with his mother and do that. (DS-10) He didn't use this test because he didn't have access to somebody easily. [N.T., 9/4/2014, p. 142].

94. Dr. Cooke never spoke to defendant's mother, sister or brother to confirm either what defendant told him or to support his assumptions or inferences. Dr. Cooke never testified that he tried to obtain access to either defendant's mother, brother, or sister. [N.T., 9/4/2014, p. 145-146].

95. Regarding the Assessment, Understanding and Appreciation of *Miranda* Rights test and booklet, Dr. Cooke utilized the very form presented to defendant by the Detective Nolan. When asked by Dr. Cooke, defendant understood what "right to remain silent meant;" he understood what it meant that what he says can be used against him; he

understood that he could have an attorney present; he understood he could have a lawyer appointed for him; and that he understood that giving up his rights meant and giving a statement now meant talking without the lawyer. [N.T., 9/4/2014, p. 156-159].

96. Dr. Cooke did state that defendant had a basic understanding as to each item, although defendant asserted that Detective Nolan did not read him the rights, but that he was given these to read himself and that he was unable to do so. [N.T., 9/4/2014, p.158-159].

97. Dr. Cooke's assessment that defendant doesn't understand the concept of a right or how the rights actually function is based on defendant's answers to questions asked by him. [N.T., 9/4/2014, p. 160-161]. His overall conclusion is that defendant does not understand the concept of a right or how the rights function in an interrogation situation and therefore could not give a knowing, voluntary and intelligent waiver of his *Miranda* rights. [N.T., 9/4/2014, p. 164].

98. As Defendant did not testify, there was no opportunity for the Commonwealth to test the validity of Dr. Cooke's opinion with regard to the waiver.

99. The number of prior contacts with law enforcement may enable a person to better understand his *Miranda* rights. [N.T., 9/4/2014, p. 166].

100. On cross-examination, Dr. Cooke started by reiterating that even though the number of prior contacts with law enforcement does have an effect on some people, he was of the opinion that given defendant's level of retardation, it does not with him. [N.T., 9/11/2014, p. 158-159, 141, 148].

101. Although Defendant had nine juvenile adjudications, Dr. Cooke testified that "it's likely that he was instructed by an attorney, by a parent, or whatever just to do whatever he ended up doing" and that this did not increase his ability to understand the function of the *Miranda* warning. [N.T., 9/11/2014, p.11].

102. The fact that the defendant has been in a courtroom setting since the age of 14 gives the defendant the understanding that something can happen to him in the courtroom. [N.T., 9/11/2014, p. 12].

103. There are three adjudications for possession with intent to deliver, June 27, 2000, December 11, 2000, and April 10, 2002, which involves financial gain so that there is a level of understanding of a buy and exchange which involves some sort of basic understanding of math and accounting. [N.T., 9/11/2014, p. 14-15]. This also involves social interaction with other people. [N.T., 9/11/2014, p. 16].

104. Defendant has been arrested ten or eleven times. [N.T., 9/11/2014, p. 16].

105. In 2003, Defendant entered a negotiated guilty plea to robbery and that the defendant was colloquied regarding the rights he had and the rights he was giving up and the court found this plea to be knowing, intelligent and voluntary. [N.T., 9/11/2014, p. 16-17].

106. On April 11, 2000, defendant entered into a negotiated guilty plea to possession of a small amount of marijuana; June 10, 2004 a plea to possession; February 11, 2005 arrested for attempted homicide and pled to criminal conspiracy to aggravated assault and although defendant is questioned as to the rights he has and the rights he is giving up, Dr. Cooke contends that he because defendant is intellectually challenged, in his experience, the person has very little understanding or a distorted understanding of what's taking place and just acquiesces. [N.T., 9/11/2014, p. 7-19].

107. Dr. Cooke was presented with defendant's *Miranda* waiver marked CS-25 dated October 14, 2004 and heard Detective Nuttall testify that defendant read paragraph number 6. [N.T., 9/11/20014, p. 19-20].

108. Dr. Cooke agreed that on CS-26 (transcript) defendant responded to the questions asked of him and acknowledged his *Miranda* rights and that it appeared that defendant was answering these questions logically and appropriately. [N.T., 9/11/2014, p. 22].

109. Defendant did advise Dr. Cooke that he had was read his *Miranda* warnings on previous occasions. "I asked him if he had heard these rights before and he said yes."[N.T., 9/11/2014, p. 24-25].

110. Dr. Cooke asserts that defendant has difficulty with short-term memory, but admitted that defendant's responses to Detective Nuttall in October, 2004 concerning the July 30, 2004 crime had a fair amount of detail. In a 2006 interview with Detective Nuttall regarding the same case, defendant, as a witness, gave a subsequent statement where he was represented by an attorney after a proffer and that this required defendant to have an understanding of what his role was in regards to the criminal case. [N.T., 9/11/2014, p. 26-30].

111. On page 4 of his report, Dr. Cooke states that an IEP prepared in 2004, with defendant being 19 years and three months old, indicates that defendant's reading level is three or more years behind students his age, but this could have been six or nine years because that is what's required for special education; however, the report itself only states three years. [N.T., 9/11/2014, p. 34-36].

112. Poor school attendance and disruptive behavior certainly affected defendant's learning abilities. [N.T., 9/11/2014, p. 37].

113. With regard to Corporal Daly, who has known the defendant since he was a little boy, Dr. Cooke did not review the *Miranda* waiver Daly presented to him in a 2003 case. (CS-22) [N.T., 9/11/2014, p.39].

114. Dr. Cooke admitted that while defendant related he was teased over the years because of his inability to read, there was nothing in the school records to document this. [N.T., 9/11/2014, p. 41-42].

115. In DOC records for his conviction for prohibited offensive weapons for which he was sentenced to 21 to 42 months, defendant ordered a legal pad and ten envelopes. (CS-36). There is also a Misconduct Hearing Appeal signed by the defendant (CS-39), but Dr. Cooke contends Defendant could not have written it. [N.T., 9/11/2014, p. 47-55].

116. Dr. Cooke admitted that there were a couple of mistakes in his report, most importantly that the defendant could not drive, which he stated he assumed from what defendant told him, but when pressed, and after review of his notes, realized defendant told him directly that he could not drive and should be considered regarding defendant's adaptive abilities. Defendant has approximately 15 motor vehicle citations. [N.T., 9/11/2014 p.58-59, 141, 148].

117. On Disability Report, Form SSA 3368, defendant stated that he speaks and understands English and that he can read and understand English, but has trouble reading due to his ADHD. (CS-37) [N.T., 9/11/2014 p. 60-62].

118. The entire thrust of Dr. Cooke's testimony regarding the *Miranda* warning (CS-17) and statement (CS-19) given by defendant on February 10, 2012 is that defendant is unable to read and comprehend these. [N.T., 9/11/2014, p. 64-71]. On (CS-19) defendant said he didn't want to criminalize himself and when questioned what he meant by this, he gave Dr. Cooke an adequate answer and that at least seven times he acknowledged that he was being charged with murder. Defendant goes on to state that when dealing with a homicide you need concrete evidence and an eyewitness which exhibits some sort of appreciation for the seriousness of the case. Likewise, defendant's responses to additional questions continue to be appropriate as defendant attempts to cast himself as a witness, not the perpetrator. [N.T., 9/11/2014, p. 71-84)].

119. Continuing with his statement, Defendant advises that he has a lawyer, but doesn't mind talking, which is an understanding about not needing a lawyer. [N.T., 9/11/2014, p. 94-95].

120. Dr. Cooke was present when recorded telephone calls from the prison were played in court. (CS-34). When his brother tells him that his lawyer can get what he said deleted because he talked without a lawyer being present, defendant states, "yeah, because I got the mind of a child" and "because I don't understand or comprehend nothing you all

saying. Defendant also stated, "I'm gonna tell them like, listen man, like I can't read, write, or comprehend nothing you all say." Dr. Cooke attributes this to defendant agreeing to go along with his brother's strategy. [N.T., 9/11/2014, p. 101-102].

121. Defendant is somewhat street smart and there is a difference between street smart and book smart. [N.T., 9/11/2014, p. 102].

122. While in prison Defendant did request books and magazines and letters and he did send letters, but Dr. Cooke still opines this does not exhibit malingering. [N.T., 9/11/014 p. 104-106)].

123. The DSM-5 ha sort of done away with using IQ scores. [N.T., 9/11/2014, p. 108].

124. Dr. Cooke acknowledged that he was focusing more on the knowing and intelligent then on voluntary, because that is what Dr. Grisso's manual focuses on. [N.T., 9/11/2014, p. 111].

125. Referring to his report (DS-3), during Dr. Cooke's *Miranda* testing, when defendant was asked about the right to remain silent, he said "you ain't got to say nothing." And when asked about material being used against you, defendant stated "if somebody says something to the cops, they can use it against you." And then regarding the right to have an attorney present, defendant stated, "it means, he can wait for his lawyer before he talks. Dr. Cooke then acknowledged defendant understood what these meant. [N.T., 9/11/2014, p. 116-118].

126. Notwithstanding defendant's prior waivers of his *Miranda* rights and his lengthy involvement in the criminal justice system, including his numerous juvenile adjudications and periods of incarceration, Dr. Cooke opined that defendant was unable to knowingly and intelligent differentiate between the right to remain silent and the waiver of that right due to defendant's reaction when shown illustrations in the Assessing, Understanding and Appreciation of Miranda Rights. [N.T., 9/4/2014, p. 164];[N.T., 9/11/2014, p. 121-124].

127. Defendant did specifically tell Dr. Cooke that he didn't drive. [N.T., 9/11/2014, p.141].

128. With regard to conceptual practical domain, much of Dr. Cooke's opinion is based on information provided by the defendant. [N.T., 9/11/2014, p.143].

129. Based on answers provided by defendant, Dr. Cooke's clinical impression was that defendant was dependent on his family, but never interviewed defendant's mother brother, or sister. [N.T., 9/11/2014 p. 145-146].

**Exhibits Presented on September 16, 2014**

130. DS-12 indicates that defendant never completed the 11th grade, although he is listed as being enrolled three years for that grade. A review of the transcript shows that defendant was absent numerous days. In 2001 - 2002 he missed 107 days and in 2002 – 2003 a W22 for non-attendance is noted, while for 2003-2204, the only listing is a rank of 257/261.

131. Defendant offered DS-12 in support of testimony by Dr. Cooke.

132. DS-13 (DSM-5, pg. 33) was also offered in support of testimony by Dr. Cooke. This page by itself offers the court little guidance. However, in the section titled Specifiers, it states that IQ measures are less valid in the lower end of the IQ range. It does provide the diagnostic criteria; however, it would have been useful if Dr. Cooke had made this available to counsel for the Commonwealth and the Court at the time of his testimony. In a vacuum, there are aspects of the criteria which, on their face, run counter to Dr. Cooke's testimony.

133. The Court did listen to the audio disc (CS-38) which was the open guilty plea to Information B, Possession of Prohibited Offensive Weapons, entered by the Defendant on January 31, 2008 before the Honorable Kevin F. Kelly, as well as the colloquy of the defendant by his attorney and by Judge Kelly. The audio was clear and defendant answered all questions coherently. Defendant, under oath, advised the Court that he understood his rights and that he read, wrote, spoke and understood English. Furthermore, defendant's attorney attested that his waiver was knowing, voluntary and intelligent and Judge Kelly found it to be so. (152)

134. In conjunction with the open guilty plea, defendant executed the Guilty Plea Statement and Statement of Post-Sentence Rights. (CS-39). In both documents, defendant stated that "I can read, write, speak and understand the English language." Additionally, defendant stated that "I do not have any physical, emotional or mental problems which affect my ability to understand what I am doing today, the rights which I have and the rights which I am giving up ... ."

## CONCLUSIONS OF LAW

1. The Court finds the testimony of Detective James Nolan wholly credible.

2. The Court finds the testimony of Thomas Omlor and Thomas Hardy wholly credible.

3. The Court finds the testimony of Corporal Michael Daly wholly credible.

4. The Court finds the testimony of Detective Todd Nuttall wholly credible.

5. The Court finds the testimony of Dr. Gerald Cooke to be fairly consistent with his report, but not fully credible and will be weighted accordingly.

6. Defendant's claims as to inspection of evidence, motion to compel discovery, production of witness statements and production of exculpatory evidence are denied as moot. The Commonwealth has an "open file" policy and ADA Urban has advised the Court that all discoverable materials have been provided including any that defense counsel may deem to be exculpatory. Furthermore, all statements by defendant Jamir Williams have been provided and have been marked as exhibits.

7. The Court has appointed the fact investigator as requested by the defendant and thus, this motion is denied as moot.

**Pre-Arrest Delay**

8. "Pre-arrest delay may violate a defendant's due process right. However, a defendant's due process right against pre-arrest delay is limited; law enforcement is not required to make an arrest as soon as enough evidence has been accumulated to constitute probable cause, or even proof beyond a reasonable doubt." *Commonwealth v. Simpson*, 620 Pa. 60, 110 (2013) citing *Commonwealth v. Daniels*, 480 Pa. 340 (1978).

9. Only if a defendant can show that "the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution is he entitled to relief." Commonwealth v. Simpson, 620 Pa. 60, 110 (2013) citing *Commonwealth v. Snyder*, 552 Pa. 44 (1998).

10. The initial burden is on the defendant to establish that pre-arrest delay caused "actual prejudice and the subsequent burden upon the Commonwealth to provide a reasonable basis for the extended delay in prosecuting the crime." *Commonwealth v. Wright*, 865 A.2d 894 (Pa. Super. 2004).

11. The careful, methodical and prudent investigation by the City of Chester Police Department, as set forth by the testimony of Detectives Nolan and Nuttall, did not prejudice the defendant. Corroboration of information is a vital and essential component in any criminal investigation. The safety of witnesses and the quality of the information provided by witnesses are critical factors in the investigation process. Likewise, all major criminal cases require close analysis by the Office of the District Attorney, as was detailed by Detective Nolan in this case.

12. The defendant, who initially claimed to be an eyewitness, never stepped forward to offer information to the police. Other than the bald statement of counsel that defendant is prejudiced by his inability to identify and locate witnesses, there was neither a shred of evidence nor even a hint of such at any time during the days of testimony. Therefore,

there is absolutely no basis for defendant's claim that there was an intentional delay in prosecution that adversely affected or prejudiced his ability to prepare a proper defense.

13. This Court has honored all defense requests to retain investigators and/or expert witnesses. Additionally, there was no testimony offered to support defendant's contention that he hindered in the preparation of his defense. The Court finds that defense counsel has not been hampered or impeded in his ability to prepare a proper defense.

14. This Court finds that the defendant has not met his burden of establishing the defendant suffered actual prejudice; therefore, defendant's request for dismissal of charges based on delay in prosecution is **DENIED.**

**Pre-Trial Identification**

15. "A pre-trial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification." *Commonwealth v. Lark*, 91 A.3d 165, 168 (Pa. Super. 2014).

16. "In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Armstong*, 74 A.3d 228, 238 (Pa.Super.2013).

17. Defendant's assertion that the pre-trial identification by his girlfriend, Candy Minehart, was improper is without support. The testimony of Detectives Nolan and Nuttal unequivocally establish how the photo array was compiled, how it was presented to the girlfriend and the girlfriend's selection of defendant's photo.

18. The photo array consisted of eight African American males, all with some form of facial hair, and within four years of Defendant's date of birth.

19. Detective Nolan did not tell defendant's girlfriend what picture was the defendant. When shown the array, she immediately circled the defendant and initialed and dated the photo array without any assistance.

20. Furthermore, a review of the transcript fails to reveal any substantive or procedural defect in the process and none was elicited by defense counsel. Not to be lost is the undeniable fact that defendant had an on-going relationship with this witness; thus, the reliability of the identification is unassailable.

21. The request to suppress the pre-trial identification is **DENIED.**

**Voluntariness of Defendant's Statements to Police**

22. To protect against self-incrimination, confession and other statements obtained through custodial interrogation are admissible only if declarant is warned before questioning, in clear and unequivocal terms, that
    a. He has the right to remain silent;
    b. That any statement he makes may be used as evidence against the declarant;
    c. That he has the right to consult with an attorney and to have an attorney present during interrogation; and
    d. If declarant is indigent, an attorney will be appointed to represent him. *Miranda v. Arizona*, 384 US 436 (1966).

23. Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of their Miranda rights. *Commonwealth v. Kunkle*, 79 A.3d 1173 (Pa. Super. 2013).

24. In considering whether a defendant has validly waived his Miranda rights, the trial court engages in a two-pronged analysis: (1) whether the waiver was voluntary, in the sense that the defendant's choice was not the end result of governmental pressure; and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice. *Commonwealth v. Kunkle*, 79 A.3d 1173, 1180 (Pa. Super. 2013) citing *Commonwealth v. Pruitt*, 951 A.2d 307 (Pa. 2008).

25. The question of voluntariness isn't whether or not defendant would have confessed without interrogation, "but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. *Commonwealth v. Rushing*, 71 A.3d 939 (Pa. Super 2013).

26. "The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement." *Commonwealth v. Bryant*, 620 Pa. 218 (2013).

27. The Pennsylvania Supreme Court has set forth the following numerous factors that should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: "the duration and means of interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion." *Commonwealth v. Bryant*, 620 Pa. 218 (2013).

28. There is not a scintilla of evidence that the pre-interview of the defendant was coercive, threatening, or hostile. The testimony by Detectives Nolan and Nuttal spelled out the reason for the pre-interview and how it was conducted. Furthermore, on the audio tape of defendant's statement following the pre-interview, defendant's demeanor, cadence, comprehension and articulation belie any hint of fear, apprehension, or anxiety which would be expected had the police acted in an unprofessional or threatening manner. Therefore, the Court finds that defendant's rights were not infringed upon or violated in the pre-interview.

29. The defendant was clearly apprised of his *Miranda* rights. Defendant was presented with the City of Chester "*Miranda* Warning Form." Detective Nolan testified that he read each paragraph to the defendant and then defendant initialed each of the six paragraphs. Defendant then signed the form, which is dated 2/10/12. (CS-17).

30. On the audio tape recording of defendant's statement regarding the J&S Seafood shooting, defendant acknowledges that the detectives went through the form with him and that he initialed and signed it. (CS-18 and CS-19).

31. For the reasons set forth below, the Court finds that defendant's waiver of his *Miranda* rights and the statement he gave subsequent thereto was done knowingly, intelligently and voluntarily.

32. Based on the documented history, the defendant is borderline "intellectual disabled."

33. In forming his opinion, Dr. Cooke relied on certain tests that were not administered to the defendant as required. There was no testimony that Dr. Cooke's intervention and unconventional method of administering the tests were the result of defendant's inability to actual perform the tests; rather, there was an assumption by Dr. Cooke that defendant had a reading disability which prevented defendant from being able to perform the tests. Although he opines defendant's scores would have been much lower if he had not intervened, his failure to even have the defendant attempt to perform the tests seriously undermines this opinion.

34. The defense offered as exhibits the results of several tests administered to defendant by others, but never produced, let alone marked, the tests allegedly administered by Dr. Cooke, all of which were relied upon Dr. Cooke to support his opinion regarding defendant's inability to understand and appreciate his *Miranda* rights. Given the absence of these tests, the Court lacks the wherewithal to objectively reconcile Dr. Cooke's opinion with hard data. Thus, the Court draws a negative inference from both the methods used and the purported results.

35. The DSM-IV places greater emphasis on "adaptive functioning" than it does on standardized IQ tests.

36. The Court's review of the entire section titled "Intellectual Disability" contained in DSM-5, as opposed to the single page provided by counsel further undercuts Dr. Cooke's testimony. In discussing Criteria B, which pertains to deficits in adaptive functioning, Dr. Cooke glossed over or ignored several key components. For example, "the Social Domain involves awareness of others' thoughts, feelings, and experiences; empathy, interpersonal skills; friendship abilities; and social judgment among others." (Page 37). In all the recorded conversations, defendant never exhibited an inability to engage in a reasonably intelligent conversation; yet, Dr. Cooke never addresses this aspect. This is particularly critical because Dr. Cooke did admit that defendant did have a degree of "street smarts."

37. Dr. Cooke opines that defendant is a person who, because of his impaired adaptive abilities, along with a low IQ score, meets the criteria for Intellectual Disabilities. (Report pg. 13). The underpinning for the adaptive abilities portion of this opinion relies substantially on what defendant told him. Of extremely significant importance is the complete failure of Dr. Cooke to interview defendant's mother, brother, or sister. When analyzing defendant's "adaptive functioning" in the Conceptual Domain, the Social Domain and the Practical Domain, as set forth in DSM-5, his report and testimony are replete with examples of reliance upon these persons. Dr. Cooke then assumes, without confirmation or verification, that what he was told by the defendant is accurate. The Court cannot accept this analysis and opinion, because the taped statements given by defendant, as well as his criminal history, demonstrate a person who does function within the community on a daily basis.

38. The illustrations in the text "Assessing, Understanding and Appreciation of Miranda Rights" utilized by Dr. Cooke do not comport with the interview setting in which defendant waived his *Miranda* rights and presented his statement. Likewise, the Court finds the illustrations themselves to be suggestive of coerciveness and designed to illicit a response in accord therewith.

39. The defendant is very, very familiar with the criminal justice system. In 2006, entered into a plea agreement wherein he admitted to his participation in in an attempted homicide. Defendant was represented by counsel and did execute a proffer agreement and a memorandum of plea agreement regarding his involvement and did testify in this matter. (CS-5 and CS-6). As a result of his cooperation, defendant pled to a lesser charge and was given a sentence of 9 to 24 months less a day. (CS-4). Deputy District Attorney McDevitt was questioned under oath in court about the plea agreement and based upon his interaction with the defendant stated that defendant entered into the agreement knowingly, voluntarily and intelligently. (CS-7).

40. The audio recording of the statement provided by the defendant in this matter, as well as the transcript thereof, demonstrates a person who is aware of his surroundings;

appreciates the nature of his involvement, i.e. suspect, not solely a witness; understands that he doesn't want to criminalize himself; and is attempting to divert the focus of the investigation in another direction.

41. The defendant did appreciate and did understand that he was charged with the homicide at J&S Seafood; that he was being interviewed specifically regarding that murder; that he need not speak with the police; that he could have a lawyer if he wanted one; and that whatever he said could be and would be used against him in future court proceedings. This is supported by the fact that he clearly stated he did want to criminalize himself, which even Dr. Cooke acknowledged indicated some familiarity with what was taking place and the possible consequences thereof.

42. This Court finds that the statement Defendant made to the detectives was knowing, voluntary, and intelligent and the motion to suppress the statements is **DENIED.**

Additional findings of fact and conclusions of law will be submitted in the Opinion of the Court at the appropriate time, should it be deemed necessary.

BY THE COURT:

_____
Judge John P. Capuzzi, Sr.

Cc: Sandra Urban, Esquire
Michael Wiseman, Esquire

*Appendix B*

COMMONWEALTH OF PENNSYLVANIA | CP-23-CR-3302-2012

V.

Jamir Williams

## ORDER

AND NOW, to wit, this 17th day of October, 2014, upon consideration of

**DEFENDANT'S FURTHER PRE-TRIAL MOTIONS** and after the

Commonwealth's oral response thereto, it is hereby **ORDERED** and **DECREED**

as follows:

1. The Commonwealth is to advise defense counsel if either Emil Williams or

   Kandie Meinhart have, within the last ten years, been cooperating witnesses

   in other cases for which either person received favorable consideration in

   exchange for that cooperation.

2. Defendant's request to have foul language redacted from his statement is

   **Denied,** as this would clearly alter the context of the statement.

3. Defendant's request to redact alleged hearsay-within-hearsay is **Granted**

   only as follows:

   a. Page 5, Line 1: from "that I wanna......" through Line 8;

b. Page 10, Line 1 from "Look, bring your…." through Line 2; and

c. Page 10, Lines 14/15 "most of what I her to this point, leans towards you and that's why."

4. Defendant's request to redact references to having been shot is **Granted** as follows:

a. Page 4, Line 11: "Um we also discussed the fact that you were shot a couple times."

b. Page 21, Line 9: "like the person that shot me. If I knew who did it I would tell on his ass."

c. Page 21, Lines 13 through 28;

d. Page 22, Line 1 through Line 12 ending at "they names"

e. Page 28, Line 18 :"I got shot five times, for this shit that I ain't got nothing to do with" and

f. Page 34, Lines 12 through 24.

5. Defendant's request to redact references to prior dealings with law enforcement is **Granted** as follows:

a. Page 29, Line 16: "I probably gave him his case and he still shitted on me and my family, you know what I mean, real rap."

6. Defendant's request to redact references to prior bad acts/incarceration is **Granted** as follows:

a. Page 9, Line 15: "I'm trying to get put into a safer prison environment".

b. Page 29, Line 27: "I thought it was going to be some shit like drugs."

7. Defendant's request to redact references to remain silent or alleged conversations with counsel is **DENIED.**

8. Defendant's request to redact last line of statement is **Granted** as follows:

a. Page 35, Line 19: "What I'm saying is we want everybody to know where the truth is and that we're handling things properly but"

BY THE COURT:

_____
John P. Capuzzi, Sr.                    J.

Cc: Sandra Urban, Esquire
Michael Wiseman, Esquire

FILED IN OPEN COURT

10/17/14

*Appendix C*

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | CP-23-CR-3302-2012 |
| V. | |
| Jamir Williams | |

## ORDER

AND NOW, to wit, this 21st day of October, 2014, upon consideration of the Commonwealth's **MOTION IN LIMINE REGARDING THE TESTIMONY OF WITNESS EMIL WILLIAMS,** the Defendant's response thereto and after argument by counsel, it is hereby **ORDERED** and **DECREED** as follows:

Counsel for Defendant, Jamir Williams, may cross-examine witness Emil Williams with regard to the open criminal cases that form the basis for his plea agreement with the Commonwealth and any criminal convictions in the nature of *crimen falsi* that occurred within the last ten (10) years or for which the witness is still under supervision. Counsel for Defendant may not cross-examine the witness on his conviction for Possession with Intent to Deliver for which the witness is currently under supervision of the Pennsylvania Board of Probation and Parole; nor may counsel inquire into the witnesses' underlying criminal background except as set forth above. Likewise, counsel for Defendant may not address the issue of possible sentence enhancement.

BY THE COURT:

_____
John P. Capuzzi, Sr.                    J.

**FILED IN OPEN COURT**

10/21/14